UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FRIENDS OF MAGNUSON PARK,<br><br>Plaintiff,<br><br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS, *et al.*,<br><br>Defendants. | CASE NO. C08-0062RSM<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |

## **I. INTRODUCTION**

This matter comes before the Court on Plaintiff's "Motion for Preliminary Injunction." (Dkt. #7). Plaintiff requests that this Court enter a preliminary injunction halting all construction activities for the development of five athletic fields at Magnuson Park in Seattle, Washington. Plaintiff specifically argues Defendants have not complied with the requirements of the Clean Water Act in their decision to issue a permit to fill wetlands and allow the construction of these athletic fields. Plaintiff further argues that it is entitled to such relief because it has shown that it will succeed on the merits, irreparable harm will result if a preliminary injunction is not granted, and the balance of hardships tips in its favor.

Defendants respond that Plaintiff has not shown it will succeed on the merits, because its decision to fill the wetlands complied with federal law. Defendants further contend that Plaintiff has failed to show that irreparable harm will result, and that the balance of hardships do not tip in Plaintiff's favor.

MEMORANDUM ORDER
PAGE - 1

For the reasons set forth below, the Court agrees with Defendants, and DENIES Plaintiff's "Motion for Preliminary Injunction."

## II. DISCUSSION

### A. Background

Defendant City of Seattle ("the City"), through its Parks and Recreation Department, manages Magnuson Park, an approximately 350-acre park located in Seattle, Washington. (Dkt. #18, Administrative Record ("AR") at 3). Magnuson Park is on a peninsula surrounded by Lake Washington, and the park contains historic Naval Air Station structures, athletic fields, parking lots, open habitat areas, paths, an off-leash dog area, a playground, and a boat launch. (*Id.*). A Master Plan for Magnuson Park was completed in 2001 to develop a Regional Sports Complex. (*Id.*); (Dkt. #1, Pl.'s Compl., ¶ 22). In response, a group of park users and neighbors who live near Magnuson Park created "Friends of Magnuson Park" ("Friends"), the Plaintiff in the instant action. (Pl.'s Compl., ¶ 10). Friends is a non-profit corporation whose stated goal is to protect the natural habitat and beauty of Magnuson Park and to ensure that future development of the park for recreational or other purposes is consistent with these goals. (*Id.*).

Meanwhile, as part of Phase 1 of the Master Plan, the City built a grass sports field at Magnuson Park that was completed in the fall of 2005. (AR at 3; 1006). Shortly thereafter, the City began Phase 2 of its Master plan by submitting a Joint Aquatic Resources Permit Application ("JARPA") to Defendant U.S. Army Corps of Engineers ("the Corps") on January 25, 2006. (*Id.* at 2); (Dkt. #7 at 3). The application requested a permit under § 404 of the Clean Water Act ("CWA") to fill or adversely modify 5.86 acres of wetlands at Magnuson Park in order to construct five athletic fields. (AR at 3). The athletic fields are intended to be used for soccer, baseball, softball, and rugby. (*Id.* at 1007, 4365).

As part of its application, the City completed and submitted an "Alternatives Analysis" to the Corps on April 6, 2007 pursuant to § 404(b)(1) of the CWA and the applicable guidelines set forth at 40 C.F.R. § 230. (*Id.* at 1005); (Pl.'s Compl., ¶ 25). These statutes generally establish the environmental criteria to be assessed by the Corps in reviewing permit applications

to fill or adversely modify wetlands.[1] The statutes also require that the Corps consider practicable alternatives to the site of the proposed discharge where the project is not water dependent.[2] Following the City's "Alternatives Analysis" submission, the Corps invited public comment on the City's proposed project by submitting a public notice on October 20, 2006. (AR at 4366). The Corps received over 160 comments on the proposal before the formal expiration date for comments on November 20, 2006. (*Id.*).

Ultimately, and after review of the original JARPA, the "Alternatives Analysis," and the public comments, the Corps granted a § 404 permit to the City for the construction of five athletic fields in its "Decision Document" on December 14, 2007, subject to special conditions. (AR at 4365). The Corps concluded that the "proposed discharge represents the least environmentally damaging practicable alternative and includes all appropriate and practicable measures to minimize adverse effects on the aquatic environment." (*Id.* at 4396). Furthermore, the Corps found that "[a]ll presumptions involving practicable alternatives in special aquatic sites have been adequately rebutted. [The Corps finds] that the proposal is in compliance with the Section 404(b)(1) Guidelines [of the CWA]." (*Id.* at 4379).

In response, Friends brought the instant lawsuit in this Court on January 15, 2008. Friends seeks a declaratory judgment from this Court that the Corps has failed to comply with federal law in issuing the § 404 permit to the City. (Pl.'s Compl., ¶ 5). In addition, Friends alleges that the Corps violated the National Environmental Policy Act ("NEPA") by failing to document the full environmental impacts of the proposed development in an Environmental Impact Statement ("EIS"). (*Id.* at ¶ 4). Consequently, Friends seeks temporary, preliminary, and permanent injunctions prohibiting the commencement of the proposed construction by the City. (*Id.* at ¶ 6). Friends now brings the instant motion for a preliminary injunction, seeking to

---

[1] The statutes shall be discussed in detail below.

[2] It is undisputed that the project proposed by the City is not water dependent.

MEMORANDUM ORDER
PAGE - 3

halt the construction activity immediately.[3]  (Dkt. #7).  Notably, Friends reserves its right to challenge the Corps' decision based on NEPA, and brings its motion for preliminary injunction based solely on the Corp's alleged violation of § 404 of the CWA.  (Dkt. #7 at 4).

### B. Standard of Review for Preliminary Injunctions

To obtain a preliminary injunction, the moving party must demonstrate either: (1) probable success on the merits and the possibility of irreparable harm; or (2) that serious questions have been raised and the balance of hardships tips in their favor. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).  Each of these two prongs "requires an examination of both the potential merits of the asserted claims and the harm or hardships faced by the parties." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 965 (9th Cir. 2002) (citations omitted).  "[T]hese two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.* (internal quotations omitted); *see also San Diego Committee Against Registration and the Draft v. Governing Board of Grossmont Union High School Dist.*, 790 F.2d 1471, 1473 n.3 (9th Cir. 1986) ("Although it sometimes appears that there are two separate tests for the grant of a preliminary injunction, in fact there is only one, best described as a continuum in which the required showing of harm varies inversely with the required showing of meritoriousness.").  In other words, a party who makes a weak showing of meritoriousness must make a very strong showing of irreparable harm.  But as a threshold matter, a party must, at the very least, show that there is a fair chance of success on the merits. *Stanley v. Univ. of Southern California*, 13 F.3d 1313, 1319 (9th Cir. 1994); *see also Benda v. Grand Lodge of Intern. Ass'n of Machinists and Aerospace Workers*, 584 F.2d 308, 315 (9th Cir. 1978) ("No chance of success at all [on the merits] . . . will not suffice.").  Accordingly, the Court analyzes the relevant factors below.

### C. Likelihood of Success on the Merits

Friends argues that it will likely succeed on the merits of the case because the Corps'

---

[3] Friends indicates to the Court that the City has already began its construction of the athletic fields in early April of 2008.  (Dkt. #7, Decl. of Mann, ¶ 4).

1  decision to grant the City's § 404 application was arbitrary and capricious. Specifically, Friends
2  indicates the CWA presumes that there are less environmentally damaging sites where a project
3  requiring wetland fill is not water dependent, as is the case here, and that the City's
4  "Alternatives Analysis" did not come close to rebutting this strong presumption. Therefore the
5  crux of Friends' argument with respect to the instant motion is that the Corps relied on a flawed
6  and inadequate "Alternatives Analysis" in support of its decision to grant the City's proposal
7  under § 404 of the CWA and its applicable regulations.

8  Accordingly, the Court will examine the relevant portions of the CWA and the standard
9  of review this Court must employ to make its ultimate determination of whether Friends can
10 make a showing that it will succeed on the merits.

**1. The Clean Water Act**

The CWA, as codified by 33 U.S.C. §§ 1251 *et seq.*, establishes a comprehensive scheme to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Under § 404 of the CWA, any discharge of dredged or fill materials into "navigable waters" requires a permit issued by the Corps. 33 U.S.C. §§ 1311(a), 1344, 1362(6), (12). Section 502(7) of the CWA defines navigable waters as "waters of the United States," which in turn includes certain wetlands. 33 U.S.C. § 1362(7). Furthermore, the CWA provides that permit decisions should be based on guidelines developed by the Administrator of the Environmental Protection Agency ("EPA"), in conjunction with the Secretary of the Army. 33 U.S.C. § 1344(b)(1). These guidelines are set forth at 40 C.F.R. § 230. The relevant provisions of 40 C.F.R. § 230 provide in pertinent part:

> (a) Except as provided under section 404(b)(2), no discharge of dredged of fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.
>
> * * *
>
> (2) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes.
>
> * * *

  (3) Where the activity associated with a discharge which is proposed for a special aquatic site . . . does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise.  In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

\* \* \*

(d) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem.

40 C.F.R. § 230.10(a)-(d).

## 2. Standard of Review of Agency Decisions

The Administrative Procedures Act ("APA") provides that with respect to any agency decision, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). This standard of review in the context of a § 404 permit application pursuant to the CWA "is highly deferential." *Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986); *Citizens Alliance to Protect Our Wetlands v. Wynn*, 908 F.Supp. 825, 830 (W.D.Wa. 1995). "While the Court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . the ultimate standard of review is a narrow one.'" *Hintz*, 800 F.2d at 831 (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814 (1971)).  The court must further determine whether the agency "articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246 (1983).  A court ultimately "may not set aside agency action as arbitrary or capricious *unless there is no rational basis for the action*." *Id.* (citing *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1027 (9th Cir. 1980)) (emphasis added).

Judicial review of agency action is generally limited to a review of the administrative

MEMORANDUM ORDER
PAGE - 6

record. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744-45, 105 S.Ct. 1598 (1985); *see also Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). As a result, the task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court. *Volpe*, 401 U.S. at 419. A reviewing court may also consider evidence outside the administrative record as necessary to explain agency action. *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1159 (9th Cir. 1980).

### 3. The Four Practicable Alternatives Offered by the City

As mentioned above, the City submitted an "Alternatives Analysis" to its original JARPA on April 6, 2007. (AR at 1005). The "Alternatives Analysis" proposed four different alternatives to the proposed construction of five clustered athletic fields at Magnuson Park: an on-site alternative at Magnuson Park that scattered the fields across the park; and three sites within the City's Park system that could potentially accommodate the five athletic fields proposed. (AR at 1020-1035). The Court summarizes the findings the Corps made in their "Decision Document" with respect to each practicable alternative below.

#### a. On-site Alternative at Magnuson Park

The City first suggested an on-site alternative at Magnuson Park by scattering the fields across the park, rather than clustering them in one area as they originally proposed. The City provided the Corps with an explanation of this alternative along with a table providing the methods by which it could achieve its project objectives. (AR at 1020-1024). The City found, among other things, that "[t]he sole advantage of this option would be to have less direct wetland loss. From an ecological perspective, however, it would result in greater long-term impact to overall habitat function." (AR at 1020). The Corps evaluated and ultimately approved of the City's justification in rejecting it. The Corps stated:

> If the applicant divided up the 5 playfields . . . instead of concentrating them at one site, it would displace other planned uses within the park. It would essentially eliminate the large uninterrupted habitat area, eliminate the opportunity to create a "flow-through" system for drainage from the fields moving through wetlands from west to east, and most likely would also eliminate daylighting of the storm drain that currently exists

MEMORANDUM ORDER
PAGE - 7

under the site. It would also require improvements to parking, at an additional cost of about $60,000. It would impact approximately 1.7 acres of wetlands. The Corps finds it reasonable to accept the applicant's extensive regional planning process as adequate to support the clustering of 5 playing fields at a single location, and this is congruent with the project purpose.

(AR at 4378).

### b. Lincoln Park

The City also considered Lincoln Park, a 135-acre park located in West Seattle. (AR at 1025). The City indicated that this park could accommodate the fields, but that the "overall habitat impacts could be considered greater [than at Magnuson Park], as there would be no required compensation for upland habitat loss." (AR at 1035). The City also indicated this alternative would "require new parking lots and access roads to accommodate the expected users of a suite of five new fields." (*Id.*). The Corps agreed with the City's findings, stating:

> The applicant rejected this alternative due to the potential impacts to mature forests (up to 75 years old), impacts to the adjacent marine sanctuary, unstable slopes that would require significant grading and engineering, lack of sufficient parking infrastructure, increased traffic on existing arterials, and close proximity to existing residential areas. Up to 181 new parking spaces and 180 lineal feet of new access roads would need to be constructed, along with major stormwater handling improvements, all at a cost of hundreds of thousands of dollars. The Corps evaluated the applicant's rationale and concurred that this site has substantive site development constraints and greater potential for environmental impacts than the proposed site . . . The Corps concurs with the applicant's findings.

(AR at 4377).

### c. Discovery Park

The City also evaluated Discovery Park, a 534-acre park located in Seattle's Magnolia neighborhood. (AR at 1027). Similar to the Lincoln Park alternative, the City concluded that overall habitat impacts would be greater than at Magnuson Park. (AR at 1035). The City likewise found that new parking lots and access roads would be needed for this location as well. Again, the Corps agreed with the City's findings, stating:

> The applicant rejected this alternative because of the need for upgrades to the existing roadways and parking facilities, engineered retaining walls to create level places for fields, potential increases to arterial traffic, the adjacency of the Ft. Lawton historic zone, unstable slopes, and impacts to sensitive habitats. Up to 181 new parking spaces and 1,200 lineal feet of new access roads would need to be constructed, along with major stormwater handling improvements, all at a cost of hundreds of thousands of dollars. Existing residential areas are not in close proximity, but access to the park must traverse existing residential neighborhoods where traffic concerns by residents are

MEMORANDUM ORDER
PAGE - 8

already high and closely monitored. The Corps concurs with the applicant's findings. (AR at 4377).

### d. Jefferson Park

The last alternative evaluated by the City was the Beacon Reservoir at Jefferson Park, located in Seattle's Beacon Hill neighborhood. (AR at 1030). The City indicated that "[f]rom a habitat standpoint, Beacon Reservoir poses the least damage or potential threat to any habitats, as none exist in current conditions (save 'typical' urban lawn/open treed landscapes)." (*Id*.). However, the City also found that "there [are] no environmental benefits associated with the project either: no water quality improvement, an increase in pollution generating impervious surfaces (e.g., parking lots), and no increase in habitat functions over time." (*Id*. at 1034). The City further found that "[e]xisting slopes would require extensive grading and engineering to produce the large level areas for field construction of the five fields." (*Id*. at 1030). The Corps "was most intrigued by this site because it met most of the applicant's criteria and would result in no impacts to wetlands." (AR at 4377). Therefore the Corps "requested further information from the applicant regarding the practicability of this site, which [the City] supplied on October 11, 2007." (*Id*.). Ultimately, the Corps agreed with the City's rejection of this site, stating:

> The applicant rejected this as an alternative because of engineering implications (the fields would be on top of a water reservoir cap) . . . We concurred that the site would have greater light impacts because of the nearby residential areas. The lights would be elevated above the surrounding neighborhoods and would, therefore, have greater potential to disturb the area through increased nighttime light nuisance . . . Up to 181 new parking spaces and 500 lineal feet of new access roads would need to be constructed, along with major stormwater handling improvements, all at a cost of hundreds of thousands of dollars. Based on the Corps' evaluation and the City's supplemental information, the Corps concurs with the applicant's findings.

(*Id*. at 4377-4378).

### 4. The Corp's Decision to Grant the § 404 Permit was Rationally Based

Based on a review of the evidence mentioned above, the Court finds that the Corps' decision was rationally based, and not arbitrary and capricious as Friends contends. When a project is not water dependent, as is the case here, the regulations presume that practicable alternatives are available unless clearly demonstrated otherwise. *See* 40 C.F.R. § 230.10(a)(3); *Sylvester v. U.S. Army Corps of Engineers*, 882 F.2d 407, 409 (9th Cir. 1989) (citations

MEMORANDUM ORDER
PAGE - 9

omitted). However, this presumption "does not serve as an automatic bar to issuance of a permit . . . [it] simply necessitates a more persuasive showing than otherwise concerning the lack of alternatives." *Louisiana Wildlife Fed'n, Inc. v. York*, 603 F.Supp. 518, 527 (W.D.La. 1984), *aff'd in part and vacated in part*, 761 F.2d 1044 (5th Cir. 1985). "In evaluating whether an alternative site is practicable, the Corps may legitimately consider such facts as cost to the applicant and logistics. In addition, the Corps has a duty to consider the applicant's purpose." *Bering Strait Citizens for Responsible Resource Development v. U.S. Army Corps of Engineers*, 511 F.3d 1011, 1020 (9th Cir. 2008) (citation omitted); *see also Hintz*, 800 F.2d at 833 ("The regulations explicitly charge the Corps with taking cost, existing technology and logistics in light of overall project purposes."). Therefore the Corps need not consider alternatives solely in terms of environmental impact.[4] *Id.*

In similar circumstances, the Ninth Circuit has held that the Corps' decision-making process was not arbitrary or capricious in the context of a § 404 application. For example, in *Hintz*, a corporation seeking to construct a logging yard filed an application to the Corps to fill a seventeen-acre wetland area that was considered to be a valuable habitat for numerous species of birds, as well as an important wintering and migratory spot for ducks, geese, and other waterfowl. 800 F.2d at 825. The corporation proposed four alternative sites for its logging yard. *Id.* at 833. The Corps concluded that based on a review of the information provided by the corporation with respect to the alternative sites, as well as information from other interested parties, no practicable alternative existed. *Id.* Furthermore, the court found that "[o]f the four proposed alternative sites, the Corps rationally concluded that the two were too costly for the applicant, and two were logistically unfeasible in light of [the corporation's] legitimate purposes." *Id.* at 833-34. The Court further held that even where an argument can be made that an alternative site is suitable, it is inappropriate for a court to overturn the Corps' findings

---

[4] Other circuits are also in agreement that the Corps may consider factors other than environmental impact when evaluating a practicable alternative. *See Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257 (10th Cir. 2004); *Town of Norfolk v. U.S. Army Corps of Engineers*, 968 F.2d 1428 (1st Cir. 1992); *York*, 761 F.2d 1044 (5th Cir. 1985).

MEMORANDUM ORDER
PAGE - 10

so long as the Corps' decision was rational. *Id.* at 834.

Additionally, in *Bering*, the court found that the Corps adequately rebutted the presumption imposed by the CWA that practicable alternatives existed because the project was not water dependent. 511 F.3d at 1020-21. In that case, a company applied for a § 404 permit to fill 346.5 acres of wetlands in order to build two open-pit gold mines in Nome, Alaska. *Id.* at 1016. The company provided an additional "Alternatives Analysis" to the Corps, and the Corps concluded that the alternatives submitted by the company were impracticable due to various environmental and engineering reasons. *Id.* at 1020 ("[A]ll alternatives were impracticable because the nearby uplands were too steep to stabilize the facilities, because the alternative designs would require the destruction of higher value wetlands, or would expand the project's footprint, or because alternatives were cost prohibitive or undesirable for other reasons."). The Court held that "[t]he Corps reasonably reviewed the feasible options and reasonably concluded that the proposed design was the best alternative." *Id.* at 1021.

Here, the Court cannot find any justification in the administrative record to reverse the Corps' decision to grant the City's § 404 application, nor can it find that the Corps' decision-making process was anything short of rational. As established above, the Corps evaluated each alternative and concluded that the original project as proposed by the City at Magnuson Park was appropriate. Furthermore, the Corps provided an explanation for why it agreed with the City's rejection of each alternative. With respect to the on-site alternative, Discovery Park, and Lincoln Park, the Corps concluded that greater environmental harm would result if the City constructed the athletic fields at these locations. (AR at 4377-4378). The Corps additionally found that these alternatives would come at a significant financial cost and also presented considerable engineering challenges. (*Id.*). And with respect to the Jefferson Park alternative site, the Corps also rejected this site due to cost and engineering challenges after taking the additional step of asking the City for supplemental information. (AR at 4377). Ultimately, the Corps stated in its summary of the City's "Alternatives Analysis" that "the applicant has adequately rebutted the presumption of the availability of less environmentally damaging, practicable alternatives to meet the project purpose." (AR at 4378). The Corps further found

MEMORANDUM ORDER
PAGE - 11

that the "[o]ff-site alternatives had either greater environmental impact or were not practicable." (*Id*.). Therefore similar to *Hintz* and *Bering*, the Corps in this case rationally rejected the practicable alternatives offered by the applicant due to the environmental and engineering challenges presented by such alternatives, as well as the substantial costs associated with the alternatives.

In addition, the Corps properly considered the project's purpose in reviewing the City's § 404 application. The project purpose here "[i]s two-fold: 1) to create athletic fields within the City of Seattle, adjacent to existing parking, and infrastructure and thereby to meet more of the demand for recreational fields of the citizens of Seattle; and 2) to improve habitat functions within on-site wetlands, and upland habitats; create structurally complex and species-rich functional upland habitat, create new HGM wetland types, and enhance existing wetlands on-site to improve functions." (*Id.* at 1006-07). The Corps properly took these purposes into account in its review of the City's application, as it fully discussed each of these purposes in its "Decision Document."

Nevertheless, Friends indicates that case law is clear in establishing that "an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable." *Sylvester*, 882 F.2d at 409. Based on this principle, Friends argues the Corps improperly redefined the project purpose in rejecting the practicable alternatives. Friends specifically contends that the Corps assumed that an element of the project purpose was to cluster the fields in one location, when the project purpose in the City's Alternative Analysis submission did not expressly state such a purpose. However, nothing in the record suggests that the Corps redefined the purpose of this project. The City is clear in emphasizing throughout its analysis that the clustering of the fields is one of the objectives of the project.[5] For example, in a graph summarizing its objectives, the City states that the "[f]ields are clustered on the western side of the project area, adjacent to existing access roads

---

[5] Friends acknowledges this purpose, when stating that "the City later states that one of its defined criteria for identifying alternative sites was the ability to place a suite of [five] fields in one place[.]" (Dkt. #17 at 5).

MEMORANDUM ORDER
PAGE - 12

and large parking lots. Existing road and trail alignments will be maintained where possible for internal movement between fields." (AR at 1017). In addition, the City reiterates in its review of an on-site alternative that its objective is to cluster the fields on the west edge of the project area. (*Id.* at 1020). Therefore there was nothing arbitrary or capricious about the Corps' decision to take into account the cluster criterion as proposed by the City. The Corps fulfilled its "duty to take into account the objectives of the applicant's project," *Sylvester*, 882 F.2d at 409, and in no way did the Corps redefine the project purpose as Friends alleges.

The Corps' decision was also rationally based because they properly considered the proposed mitigation plan submitted by the City. (AR at 4365, 4391-4393). Pursuant to 40 C.F.R. 230.10(d), "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic system." Here, the City submitted a mitigation plan designed to compensate for the loss of the 5.86 acres to be filled by its project. (AR at 4391). The Corps concluded that "the Mitigation Plan will result in the establishment and rehabilitation of wetlands in a rough proportionality to the project impact," and that the "proposal exceeds guidance on mitigation ratios suggested in the interagency document" of the Corps. (*Id.* at 4393). Relatedly, the mitigation plan was also consistent with the City's second project purpose, which was to improve habitat functions at Magnuson Park.[6] Therefore the Corps' review of the City's mitigation plan further supports the notion that the Corps engaged in a detailed analysis and evaluation of the City's § 404 application.

It is also worth noting that the Corps invited public comment on the City's proposed project. While Friends argues that the public process is irrelevant to the Corps' analysis of the alternatives under the guidelines (Dkt. #7 at 10), the guidelines set forth by the CWA require the Corps to take into account public interest when determining whether to issue a § 404 permit. *See* 33 C.F.R. § 320.4(a). Moreover, although 33 C.F.R. § 320.4(a) does not expressly

---

[6] Friends argues that this second project purpose is improper but fails to persuasively explain why or how this is the case.

MEMORANDUM ORDER
PAGE - 13

govern the factors to be considered in reviewing the practicable alternatives submitted by an applicant, "[p]ublic input [is] certainly important and helpful in enabling the Corps to fairly determine the permit application's conformance with [the] existing legal standards [of the CWA]." *Northwest Environmental Defense Center v. Wood*, 947 F.Supp. 1371, 1381 (D.C. Or. 1996). Here, the Corps offered a public comment period on the City's proposal after the City submitted its "Alternatives Analysis." With respect to the public process, the Corps specifically found:

> The Corps also acknowledges the inclusive public process that the applicant has engaged in for the purposes of planning recreational needs throughout the City and acknowledges the investment of substantial effort by the applicant to accommodate local residential concerns.
>
> Nothing in public record suggests the existence of a less damaging practicable alternative than the applicant's proposal. There was an extensive public process at the local level associated with the applicant's proposal. In that process, most commentators were concerned about potential impacts to nearby residential areas. The Corps also received comments similar to those the applicant received throughout their local public involvement process.

(*Id.*).

Consequently, this Court finds that inviting the public to comment on this issue also adds further support to the notion that the Corps did not act arbitrarily or capriciously in issuing the § 404 permit to the City.

Overall, the Corps properly relied on the information submitted by the City to make its determination to grant the City's § 404 application. *See Hintz*, 800 F.2d at 835-836 ("The Corps is not a business consulting firm" and may therefore base its analysis "*entirely upon information supplied by the applicant*.") (emphasis added); *see also Crutchfield v. County of Hanover*, 325 F.3d 211, 223 (4th Cir. 2003) (finding that Ninth Circuit precedent is clear in establishing that the Corps is not required to conduct independent studies, but may reasonably rely on studies given to them by applicants). The Corps properly considered the practicable alternatives submitted by the City, and properly evaluated the relevant factors, including environmental impact, cost to the applicant, logistics of constructing the athletic fields at the alternative sites, and project purpose. Moreover, the Corps adequately rebutted the presumption that practicable alternatives existed by engaging in this evaluation wherein the

MEMORANDUM ORDER
PAGE - 14

1 Corps considered the relevant factors set forth by the CWA and relevant case law. "[T]o
2 require anything further would place unreasonable and unsuitable responsibilities on the Corps,
3 which receives over 14,000 permit applications per year." *Hintz*, 800 F.2d at 835-836. Under
4 such circumstances, the Court cannot find that the Corps' decision and review of the City's
5 "Alternatives Analysis" was arbitrary and capricious. It is worth reiterating that the standard of
6 review in the context of a § 404 permit application pursuant to the CWA "is highly deferential."
7 *Id.* at 831. Thus, the Court finds that the Corps has complied with its duty under the law and its
8 decision is not subject to reversal.

9 Accordingly, the Court finds that because Friends cannot show that it will succeed on
10 the merits of this case, a preliminary injunction halting construction activities at Magnuson Park
11 is not warranted.

12 **D. Irreparable Injury and Balance of Hardships**

13 Even assuming arguendo that Friends has made a strong showing that it will succeed on
14 the merits, a preliminary injunction is not warranted because Friends cannot show irreparable
15 injury. *See Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir.
16 1985) ("Under any formulation of the test [for a preliminary injunction], plaintiff must
17 demonstrate that there exists a significant threat of irreparable injury."). Here, Friends argues
18 that irreparable injury will result if the City proceeds with its construction of the athletic fields
19 because the wetlands at issue will be irreparably damaged. In support of this argument, Friends
20 cites to Supreme Court case law that indicates that "[e]nvironmental injury, by its nature, can
21 seldom be adequately remedied by money damages and is often permanent or at least of long
22 duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will
23 usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v.*
24 *Village of Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396 (1987).

25 However, simply because a party raises an environmental issue does not automatically
26 compel a finding by a court that irreparable injury will result. It is "a fundamental principle that
27 an injunction is an equitable remedy that does not issue as of course." *Id.* at 542 (citation
28 omitted). "Although particular regard should be given to the public interest, '[t]he grant of

MEMORANDUM ORDER
PAGE - 15

jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of federal law.'" *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311, 102 S.Ct. 1798 (1982)). Furthermore, in determining whether irreparable injury will result in the context of a § 404 application, courts have taken into account the mitigation plan offered by the applicant. *See Ohio Valley Environmental Coalition v. Bulen*, 315 F.Supp.2d 821, 825 (S.D.W.Va. 2004); *Sierra Club v. U.S. Army Corps of Engineers*, 935 F.Supp. 1556, 1584 (S.D.Ala. 1996); *see also Wynn*, 908 F.Supp. at 834.[7] Friends also fails to explain why the Court should not consider the mitigation plan as part of the irreparable injury analysis.

In the instant case, and as previously discussed, the City has offered a mitigation plan to help offset the loss of the wetlands at issue. The City submitted a total of four documents between January 27, 2006 and December 12, 2007, to outline the City's mitigation proposal. (AR at 2028-2066; 4391-4392). The City essentially proposes the creation of approximately 10 acres of wetlands to replace the 5.86 acres of wetlands that will either be filled or adversely effected by the construction of the softball fields. (*Id.* at 4392). The Corps reviewed the mitigation plan, and found that:

> As compensatory mitigation the applicant plans to remove approximately 12.4 acres of existing pavement and impervious surfaces on the project site, to both reduce runoff and to improve water quality of remaining runoff; create just over 10 acres of emergent, shrub and forested wetlands; rehabilitate just over 4 acres of disturbed emergent wetlands; daylight an existing storm drain crossing the southern portion of the site; and, after pre-treating stormwater via mechanical filters . . . direct the water through nearly 1,000 linear feet of the created and rehabilitated wetlands[] prior to discharge through an existing outfall into Lake Washington.
>
> * * *

---

[7] Friends suggests that *Wynn* is distinguishable from the instant case because the wetlands at issue in *Wynn* were on private land, whereas the wetlands at issue in this case are on public land. (Dkt. #17 at 10). However, Friends' argument is unavailing because this distinction does not preclude this Court from relying on that case for the persuasive reasoning that courts can appropriately take into consideration the mitigation plan proposed by the applicant in determining whether irreparable injury will result. In any event, the list of cases in the string cite indicate that mitigation is a factor that may be considered by a court in this context, and this Court finds such reasoning persuasive.

MEMORANDUM ORDER
PAGE - 16

> The mitigation goals, including those for on-site and off-site water quality and for habitat parameters, are to create new wetlands with a diversity of community types and hydrogeomorphic (HGM) types out of existing low-quality upland habitats, preserve the hydro-period of existing wetlands to remain on the site and maintain the general movement of water across the site; rehabilitate the functions of remaining wetlands within the project area through passive and active means such as increasing the depth/duration of hydro-periods, increasing native species richness, removing and controlling invasive species, increasing physical complexity, and improving conditions in adjacent habitats; maintain or improve the physical connectivity between habitats on the site; improve water quality conditions draining into Lake Washington . . . ; and improve access for education and passive interpretation of the various habitats and water features in the project area.

(*Id.*).

The Corps concluded that the mitigation plan was reasonable, and ultimately accepted the plan. (*Id.* at 4393). Also, in granting the City's § 404 application, the Corps attached special conditions to further guarantee that the City complies with its obligations under their proposed mitigation plan. (*Id.* at 4394-4395). The Corps specifically held that "[f]ailure to comply with the commitments made in this document constitutes non-compliance with . . . your Corps permit." (*Id.* at 4394). Notably, Friends does not challenge the adequacy of the mitigation plan, choosing only to argue that this Court should not take the mitigation plan into account as part of the irreparable injury analysis. However, as established above, the mitigating effects on the City's proposed plan certainly deserve consideration as part of this analysis. Based on this plan, the Corps' review of the plan, and the special conditions the Corps attached to its § 404 permit, the Court cannot find that irreparable injury will result to the environment.

Friends also fails to show that the balance of hardships tips in its favor. *See Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9 th Cir. 2003) ("[A] party must make a *clear showing* . . . that the balance of hardships tips in its favor.") (emphasis added). Again, Friends argues that the damage to the wetlands at issue are irreparable in nature, and that the national interest in preventing the fill of wetlands in violation of federal law demonstrates that it is entitled to a preliminary injunction. However, the Court has already established that irreparable injury to the environment will not likely occur because of the City's proposed mitigation plan, and the Court has also found that the Corps' decision complied with the requirements of the CWA. In addition, when weighing the hardships imposed upon the

MEMORANDUM ORDER
PAGE - 17

1  City, the Court cannot unequivocally find that the hardships imposed upon Friends - a non-
2  profit organization created to preserve and protect the habitat of Magnuson Park - outweighs
3  those of the City - a municipality who has spent considerable resources and finances to provide
4  further recreational opportunities for its citizens and offered sufficient safeguards to protect the
5  environment from irreparable damage.  The City has already contracted for the construction of
6  this work at a cost of approximately 7.5 million dollars.  (Dkt. #10, Decl. of Jainga, ¶ 3).  In
7  addition, the Court notes that the City has already expended substantial costs in applying for its
8  § 404 permit with the Corps, and halting construction at this time would only further delay this
9  project that the City has been planning for several years.  The City and the Corps would also
10 incur significant costs in re-engaging in the § 404 permit application process, a process that has
11 likewise taken considerable time.  As a result, the Court cannot find that the balance of
12 hardships clearly tips in Friends' favor.
13    Accordingly, Friends has failed to meet its burden in establishing that it is entitled to a
14 preliminary injunction, and its motion shall be DENIED.

### III. CONCLUSION

16    Having reviewed the administrative record, Plaintiff's motion, Defendants' responses,
17 Plaintiff's reply, the declarations and exhibits attached thereto, and the remainder of the record,
18 the Court hereby finds and orders:
19    (1)  Plaintiff's "Motion for Preliminary Injunction" (Dkt. #7) is DENIED.
20    (2)  The Clerk is directed to forward a copy of this Order to all counsel of record.

22    DATED this   28   day of April, 2008.

*[signature]*

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

MEMORANDUM ORDER
PAGE - 18